All right, you can proceed. Did you want to save any time for rebuttal? Yes, Your Honor, five minutes if possible. Okay, go ahead. The four points I'd like to briefly review are the second holding of the District Court on Illinois BRIC, which was markedly different from the first holding of the District Court on Illinois BRIC, the per se versus quick look and rule of reason issue, the single brand market, the District Court's finding on a motion to dismiss that the single brand market that we alleged in our second and third amended complaint was not an appropriate relevant market on a 12b6 motion, and finally, the amendment to add Bank of America and a BANA, whether that relates back to the original filing of the complaint under the Krupski case. I'd like to refer this. You need to stay at the podium because when you move away that we record this, that you're we're losing you. I'm sorry, Your Honor. I was just trying to grab a document. At pages 158 to 163 of the record, the District Court itself on page 163 expressed the need for appellate review of these issues. This is at 163. The District Judge is ruminating about the relevant market in this case. Is this just to get you some fee at the end? I'm sorry, Your Honor. Just to get you a fee if you lose? I don't know what the District Judge ruminating about whether to come up and see me or not has to do with this. I want to know what the law is here. I understand, Judge Smith. Well, the first issue, if you don't have standing under Illinois BRIC, does that end it? If we do not have standing under Illinois BRIC, yes, that would end it. So you need to get over that hurdle first. So why don't we get to it, then? Why don't we discuss Illinois BRIC? Your Honors, plaintiffs here pay the cartel overcharges, the foreign ATM fee, directly to the price fixers. The class and the plaintiffs are limited to the plaintiffs that dealt directly, paid foreign ATM fees directly to what was originally six defendant banks is now five defendant banks because Where does STAR, this fancy little diagram or not so fancy little diagram, where does STAR fit in on this? Well, I think everyone, Judge Lucero, agrees that STAR is a switching network. It's an intermediary to move funds. STAR doesn't receive the interchange fee. STAR doesn't pay the interchange fee. The interchange fee moves between banks. So for our purposes, STAR is irrelevant, then? Yes, and that's why we simplified the diagram for purposes of this argument, Your Honor. I want to make sure that that's your position. Right. And I mean, the primary authority, in addition to Freeman, which, of course, we've relied on heavily and which has recently been cited by Under what exception to Illinois BRIC do you contend you fall to have standing? Well, I'd like to start by saying we don't fall within Illinois BRIC at all, Your Honor. Well, do you concede that you're an indirect purchaser? No, not at all, Your Honor. We are direct Just a minute. Just a minute. I thought you did concede that you were an indirect purchaser. No, Your Honor. I respectfully disagree. We are direct purchasers. As we said repeatedly both in our briefs and below, we are direct purchasers because we pay foreign ATM fees directly to the defendant banks. Those foreign ATM fees incorporate as a floor price or as part of the price a fixed interchange fee, a horizontally price-fixed interchange fee. And there's a long line of unbroken authority from at least Saucony Vacuum Oil. Well, it's my understanding you don't pay any interchange fee, only as a pass-on in the foreign ATM fee. Would you agree with that? No, Your Honor. I would agree. Well, is there any interchange fee that you pay directly to the foreign ATM? To the foreign ATM, no. We pay that fee You only pay to the defendant bank a foreign ATM fee. Isn't that correct? That is correct, Your Honor. And in that foreign ATM fee, there's an interchange fee? A fixed, a horizontally price-fixed interchange fee, which is a between the two, the ATM, foreign ATM and the defendant bank. That is passed directly to you from the defendant bank. It is charged directly to us from the defendant bank. I think charged would be a more accurate term than passed. Well, I know you don't want to say passed because that would get you in the Illinois brick. But the honest truth is, it doesn't matter. This fee, this interchange fee, is not charged directly to you. It's charged as a part of a foreign ATM fee. It is charged by the foreign ATM. It is paid to the foreign ATM by the defendant bank directly and charged directly to us, the customers, the class members, by the defendant bank. Okay. But the foreign ATM does not charge you. The foreign ATM charges a different fee. When we go to the foreign ATM Right. That's the surcharge. That's the surcharge, which is not challenged. All right. But the charge that Judge Smith is talking about, you don't pay that to the foreign ATM. We pay it to the defendant bank. That would be our position. Right. That's all I want to know. And the reason this is important is from Socony Vacuum Oil, Freeman, of course, is a classic case in point, Judge Kaczynski's opinion. The support fee, the $44 support fee, included a price fixed $22.50. I'm sorry. The fee paid by the association to the associations by the brokers, roughly 50 percent of it was a price fixed fee. It was a part of the fee. Another case that came out of this circuit, the Catalano case that went Well, I think you're arguing that you're paying it indirectly, correct? I guess my first argument, I have two arguments, Your Honor, to be, to get directly to it. My first argument is we're paying it directly because we're paying it to a conspirator. Look, I'm just trying to understand your argument. I don't care to ever be an adversary as an appellate judge, but I just want to understand arguments. That fee is not separately itemized and billed to you as a customer, is it? No, it is not, but I don't think that's and it's not directly billed as an itemized item. I just have a hard time conceptually understanding how you're doing anything other than indirectly paying it by paying your bank. Well, if there were an intermediary between our bank, which is a defendant that we have sued, if there were an intermediary between that bank and us and that intermediary was controlled by the bank and charging us the fee, then it would be an indirect purchase and we would have to fall within an exception to Illinois BRIC, like royal printing, which I think we do fall within. However, we don't even have that situation here. Under Utilicorp and under Illinois BRIC itself, we're the direct purchaser from the horizontal conspirator. Now, the fact that only part of that price that we pay the horizontal conspirator is fixed and not all of it doesn't matter because under an unbroken line of authority that the Supreme Court has decided from soak and evacuum oil, as recently as American Needle last year, which was decided by nine unanimous justices, a rare occurrence in this day and age. Well, it's not quite so rare. We get overturned. Ouch. I mean, I just have to be fair. I understand. That was the seventh that I reveled. Okay. But it's quite clear and from just to cite a few other cases, the Catalano case. That ouch was a vicarious ouch. Right. The Catalano case was a case that came out of this circuit. And the price, what was fixed was free credit terms. And the Supreme Court declared that's an inseparable part of the price. They overturned this circuit in that decision in 1980. In the Nieval-Bard case, which is from the circuit footnote 8, lists several of the cases where if you fix part of the price, that's the same as fixing the price for purposes. Are you prepared to argue beyond what's, I can't, I'm not, I don't know what the other judges think, but assuming that you are an indirect purchaser and do fall within Illinois BRIC, are you prepared to argue how you satisfy one of the exceptions? Right. Two of them. Two of them. Royal printing. You said all you've got to say about being indirect. Let's get to one of the exceptions. Well, royal printing, clearly, there's no real, as the judge held in his first decision on Illinois BRIC, there's no realistic possibility that these bank defendants would sue Starr. They're co-conspirators. They're receiving the fee, not Starr. That's the point. Receiving the fee and marking it up to their customers. And the other exception is owned or controlled by the customers. Well, here we don't. It's a little different because there's no intermediary. But the banks clearly are not going to sue themselves. They're charging us, the class members, directly. But they don't charge everyone the same, right? There's a few elite customers that maintain very high balances that have the fees waived. That doesn't affect the analysis, Your Honor. Is that illegal? Is what illegal, Your Honor? Is it illegal for a bank to say, if you keep a certain balance, that you don't have to pay certain fees at a bank? No, not at all. Not at all, Your Honor. In fact, banks, for their very high balance, customers waive a whole range of fees, not just these fees, many fees. But most customers, the vast majority in the case of the foreign ATM fee, incur these fees along with other fees. And under Freeman, I would say there's an exception because in Freeman there was an intermediary. The intermediary was Sandicor, which was owned and controlled by the associations. Just for the big picture here, is there, could you give us a percentage or a range of banks that do charge a foreign ATM fee? Well, I think all the major banks in this case charge foreign ATM fees to the vast majority of their customers. As I think our brief explained, we've never had unrestricted discovery in this case. We've had what I would call, I was going to call sporadic discovery. It's more spasmodic discovery because we've had the sequential scheduling of motion after motion after motion to decide issue after issue after issue. We've never had wide open discovery. But it is the vast majority of customers. Right. Is it undisputed that they make a profit on this? I believe so. It should be undisputed. We cited extensive record evidence, and I could give Your Honor, we have them in our brief, and I could give Your Honor some of the Wells Fargo, I think, had one document. They make $1.09 per foreign ATM transaction. In another document, they make $1.10 per foreign ATM transaction. I think we mentioned in our brief that Star estimated that its members made $432 million at one point on foreign ATM transactions and at another point over $500 million. So there's no dispute that the fee's being marked up. It's a major profit center. It's double dipping. Two documents I'd like to mention. Well, it needs to be a conspiracy, right, as opposed to a joint venture? I'm sorry, Your Honor. It needs to be a conspiracy? Well, it needs to be a combination or a conspiracy under the Sherman Act, and it doesn't matter whether it's a joint venture. And for that, I'd respectfully refer Your Honors to the unanimous American Needle decision, and for two reasons. First of all, when we argued this case first before Judge Walker, who had the case initially, and he decided the Brennan decision, he held it was a per se offense, a per se offense. And he cited Topko, which at the time the defendants disparaged Topko, disparaged the citation to Topko as if it were prehistoric because it was 35 years old at that time. But in the American Needle decision just last year, a unanimous Supreme Court twice cited Topko with approval, and that was a less offensive arrangement involving territory as opposed to price. Well, does the same rule prevail in this circuit as in other circuits, that the oldest authority prevails over more recent authority in case of conflict? In case of a conflict between an earlier decision? Or ambiguity between decisions, that the older decision prevails? I don't think there is a conflict in this circuit. That's not my question. I'm sorry, Your Honor. If there is a conflict or if there is disagreement as to which authority prevails, it's the older authority that prevails? Is that the rule here? Well, I think that as I understand the rule in this circuit, Your Honor, it's a ---- Look, it's not a costal question that I'm asking. I just think it seems to me you either know the answer or you don't. Yes. One panel cannot overrule another panel. That has to be done on a petition for rehearing by 11 judges, I believe. I may have misunderstood your question. It's all right. Go ahead. On the per se versus rule of reason question, Judge Walker, who is an antitrust expert, held that this was a per se offense. Now, that was gradually walked back by Judge Breyer, who inherited the case. And he wasn't such an expert? Is that what you're saying? I don't think he got it right in this case, Your Honor. I just thought it was interesting that Judge Walker becomes the expert. And then, Judge, then we go to somebody else, brother to the Supreme Court justice, and he walked it back. No, I think he recognized that these were difficult questions, and that's why he said at page 163 of the record that these are questions that are crying out for appellate review. But Judge Kaczynski is an acknowledged antitrust expert, and this case is stronger even than Freeman v. Sandino. Well, I think you need to dial it back, because we all have the same vote, whether you think we're an expert or not. And if our expertise depends on voting and ruling in your favor, that, you know, that's not a good definition of expertise. I wasn't trying to say that, Your Honor, but I was trying to say that Freeman, which is controlling authority and is very persuasive authority and was cited twice and quoted once in the American Needle decision by the Supreme Court last year, is very persuasive authority on this question. On the relevant market question, I'm into my rebuttal time, but on the relevant market question, I would like to say that that is for generations. In this circuit and others, that's been a question of fact for the jury most recently in the New Cal v. ICON decision. And, again, the same page is 158 to 163. The judge repaired to our experience, our experience, our experience in dealing with a motion to dismiss and saying it's easy for consumers to change banks. Is there any actor that is in a position to sue here other than the consumers? No. Assuming you're right. No, Your Honor. No, Judge Lucero. There is no other actor that can sue other than the consumers. Now, the judge — Now, does royal printing speak to that? Yes, it does. The no realistic possibility exception, which prevails and is controlling at least in this circuit, and I think is a variant of the owned or controlled exception that was spawned by Illinois Brick itself and reaffirmed in Utilicorp. Remember, Illinois Brick and Utilicorp both said the direct purchaser is the person to sue. We, the appellants, are the direct purchaser. But under royal, it doesn't matter whether you're direct or indirect if you're the only person in a position to sue, correct? That is correct, Your Honor. That is correct. I think we are direct, but even if we were ruled indirect under royal printing, unless there were an intermediary in a position to sue with an incentive to sue, we would be the right party to sue. I'd like to reserve the balance for rebuttal. Thank you, Your Honor. Thank you. Good morning. Thank you, Your Honor. I'm Deanne Maynard. I'm going to speak on behalf of all of the defendant appellees on the joint brief, and Ms. Winner is here if the Court has any questions on the separate Bank of America brief. Well, if you use the do you want to give her any time? Yes. I have ceded three minutes to her, and she's going to stand up and tap me, and I'm going to sit down. All right. Well, I'll remind you at that point, too, to sit down. Okay? She is saying no, no, no. Go for it. Go for it. Okay. All right. She's going to be back for three minutes. Thank you very much. Why don't we restart the clock, Judge Calhoun, given that with this banter? All right. Yes, please. Put it back to the original time. Thank you. Thank you very much, Your Honor. May it please the Court. The district court correctly concluded that plaintiff's claims are barred by Illinois BRIC. Well, that's the question, right? Yes, it is. It seemed to me that in that ruling that subsumes or are ignored the proposition that there's a difference between the per se or formal situation or the functional situation where we look at the transaction itself rather than the parties. Could you help us through that? Well, I'm not sure I understand exactly what you're driving at, but I'll try. And if I'm not, you know, stop me. All right. So this case is not like, because I heard you suggesting, was this like royal printing. Right. This case is not like any other case where a court has recognized an exception to Illinois BRIC. Because here ---- Well, therefore, under that analysis, you'd be totally insulated, right, assuming that the appellants are correct, that there's inappropriate conduct going on. And that's the merits. We're not going to get to that. But assume that there were. Under that interpretation, it's a free zone. No, Your Honor. There are ---- How does somebody get to you? As Judge Breyer correctly concluded, there are 1,000 pure payers of this interchange fee. Those are large credit unions and people who hold bank account deposits but have no ATM machines. They do nothing but pay this fee. And if there's anything ---- if the fee is set in an ---- All right. Just a minute. So there's inappropriate conduct going on between the banks. Between those owning the ATMs. That's right. Between those holding the ATM and those clearing the payment back to the ATM. You're saying what ---- who can sue to preclude that conduct? Well, it's important to point out there are two sets of parties to the ATM transaction who aren't alleged to be conspirators here. One set is what we call pure payers, the people I was referencing before, who do nothing but pay these interchange fees and would have every incentive to sue if they were being artificially set too high. There's another set who also aren't alleged to be conspirators who are doing nothing but receiving, about 600 of those. And then these defendants, and this is what makes this case so unusual, this is not a case where the defendants are artificially ---- alleged to be artificially setting a price too high that then they're keeping to themselves. They ---- the bank defendants here are paying to the tune of millions to people they aren't alleged to conspire with and whom they do not control. That makes this very different from royal printing and all the other cases that have recognized some kind of conspirator exception, because in all those cases, the allegedly fixed fee, the profit from that fee, is being retained by the group that is alleged to have done it. And this is why this does not fit the exception of no possibility that a direct purchaser will sue. Exactly, Your Honor. There are 1,000 pure payers who have an incentive, as the district court correctly concluded, and possibly 4,100 if you add in all of the 3,100 net payers. So what would be the incentive for your group to sue? Because your group makes a profit, right? Well, two points about that, and I'll back up and then I'll make ---- kind of back up and take a running leap. Just because the record shows that bank defendants charge in some instances, but not all, as you know, a fee, a foreign ATM fee that happens to be higher than the interchange fee that they may pay, one, doesn't mean there's actual profit, because revenue and profit aren't necessarily the same. Two, the relevant inquiry is not comparing the interchange fee, because they're not being sued based on the interchange fees that they receive for the foreign ATM charges where ---- so if a bank has a customer who goes to another bank, so say I'm a bank. I have a customer who goes to another bank and uses their card at the other bank. I charge my customer a foreign fee for that, and I pay an interchange fee to that other bank for servicing the other bank. But we ---- their whole claim is that that fee is passed on. But we know that the evidence belies that, and this is on summary judgment, the evidence belies that because we know there are lots of customers who pay no fee at all and lots of banks who charge different fees. Moreover, the claim that fundamentally ---- Kennedy, I don't follow that. If I go to an ATM and the ATM then passes an interchange fee back to my bank, when I pay my bank and I find a foreign ATM fee there, you're saying that if the bank chooses not to charge that ATM fee, that that somehow is unrelated to the interchange? It's obvious that the bank is going to subsume that expense on its own books if it doesn't pass it through to me, doesn't it? Well, I think there are two important points to make from that. One is it debunks entirely the notion that a bank is raising the cost, the out-of-pocket cost to itself in order to recover more money from its customers if it charges them nothing. Secondly, it just highlights the ---- that this claim makes no sense, because if, as they allege, you, the customer, has no idea that you're paying the foreign fee at all, if the bank would have every incentive to lower the interchange cost, those are its out-of-pocket costs it's paying to people it doesn't control, with whom it doesn't conspire, often its competitors, right, to provide them a service. No incentive, it's completely economically irrational to raise my out-of-pocket costs to others. And here it's the record evidence is undisputed that these bank defendants are net payers to the tune of multimillions of dollars. And that's the relevant comparison, Your Honor, not the comparison between the interchange fee that each bank pays versus what it may charge its customers in a foreign fee. The relevant inquiry is, are they net payers of interchange fees, and therefore, these very banks are among the 3,100 that the district court correctly found have an incentive to sue as net payers if these are artificially set high. And certainly the 1,000 who do nothing but pay have every incentive to sue. So this is far from the interchange fee. Well, for purposes of this sentence, as a matter of fact, since February of 2001, which is seven-eighths of the alleged class period, the STAR network has been a proprietary network owned by Concord. So and there was a motion made in the district court that was never ruled on that for that entire period there can be no liability at all because it's a single entity setting the fees and single entities have every right to set their fees. But assuming for this motion, what they allege is that the banks are affecting the interchange fee. But it still highlights the nonsensical nature of the claim. The complete implausibility of the claim is that the banks would get together and decide that they're going to have out-of-pocket costs to people they do not control with whom they aren't conspiring to the tune of multimillions of dollars. Simply to charge another fee of which customers are allegedly unaware, they could just charge that fee if the fee goes away, which just goes to show that, one, there is way more than a realistic possibility someone else will sue, and, two, that if you were to allow this claim, it would just introduce all the problems that Illinois BRIC said courts have no business getting into, which is, we know some customers pay nothing, so we know it's not passed on to some people. It's certainly not fair to assume it's 100 percent passed on. So this really is just a claim. These plaintiffs have no standing to bring it. But the Court should not fear. Kennedy, It seems to me that the first part of your argument goes to the implausibility of recovery, and you certainly make a very persuasive case that it just seems like nonsense and they're not going to win on the merits. But that doesn't go to standing, right? Well, I think it – I think you're right that we have a – we would also have a very strong argument that this is a completely implausible claim and should be dismissed on the merits. But I think it does, as Judge Breyer recognized, impact the standing inquiry, because the undisputed fact that these defendants are net payers shows that if there's anything to this notion that the fees are artificially set high, there are plenty of people who have standing to sue, and that prevents you from finding any kind of evidence-based facts to Illinois brick. So it's just – there is no applicable exception. This case is not like any in which a court has found exception. The closest case to this one is Dixon from the Fourth Circuit, where the Fourth Circuit didn't allow them to sue because – precisely because the fee was a wholesale price that was allegedly fixed, and the middlemen would have no incentive to raise the fee. So if I could just address the per se, unless you have more questions on this. If we find standing, then you want to go forward and address the other issues? You know, no, we – I mean, as we argue in our brief, the – we think that in this Court's precedent, the only merits ruling that goes to the judgment before the Court is the – is the Illinois brick issue, and I'm – but I'm happy to address the other questions, because we think Judge Breyer clearly correct on the other two issues, and because counsel addressed them, I didn't want to let them go unanswered if you would like to hear from me on them, but I'm also happy to take a seat if you've had enough. Kennedy, the bottom line is, if one has standing, do we have the per se violation and his ruling about per se even in front of us? Do we have the jurisdiction to even look at that? Under this Court's decision in Lloyds, I read that decision to say, no, in the Ninth Circuit, you don't believe that orders that are not central to the merits of the judgment are not on appeal, even from a final judgment. Well, but under our precedent, don't we say that we – well, and in fact, in this particular case, the judge even said something, that he felt like he wanted to rule on the per se issue first in order to help him determine if he would – if I'm short-custing what he said, but he ruled on the per se violation first before he even got to whether there was standing, because he felt like it would be helpful in the standing analysis. Well, just to clarify a little bit, the judge ruled on – Clarify would be clarify my language. I just was shortchanging what he said. Oh, I'm sorry. I was trying to clarify the record, what happened below. I was trying to clarify what he said, which is when the bank defendant moved and when the defendant moved for summary judgment on the per se claim, that was all there was to their claim. And it's only after that they've added a rule of reason. So a per se – a ruling rejecting their per se claim would have rejected the entire case. It wasn't just a case-management technique, although I think that would be a perfectly appropriate one. But, you know, I think the Court – if the Court does decide to reach these issues, Judge Breyer's decision is clearly correct. Here, this is a legitimate joint venture, and indeed, their complaint acknowledges that ATMs are pro-competitive, that banks need to provide this service to their customers. And under the Supreme Court's precedent, it's – as long as there's a plausibly pro-competitive purpose for the activity, then it gets rule of reason reviewed. And it's the very rare case now that gets per se reviewed. The evidence is abundant in this record that having the network set the rules, because, again, by definition, what you're talking about is foreign exchanges. So bank customers with whom the bank who's paying them the money or the ATM owner who's paying them the money of their ATM has no contractual relationship, so needs to know in advance under what terms and when and how much money is going to be repaid if he gives this stranger, contractual stranger, to him money, that this is obviously a core concern of the joint venture. And, therefore, if it's to be reviewed, and, again, we don't think they have standing to assert their claim at all, but if it's to be reviewed, it should be reviewed under the rule of reason. If the Court has no further questions, we would ask you to affirm the judgment. Thank you. Just one second. Just one second. There is time left on the clock. I don't – you don't have to say anything. But if you want to. It's not necessary unless the Court has questions about that. All right. And your name is? Your name is? Say your name for the record. I apologize. All right. Sonya Winter, representing Bank of America. All right. The panel does not appear to have any questions. Thank you. Your Honor, I want to start with the concept that this is a legitimate joint venture. That's not disputed. But what is important is how you analyze restraints that are not either core functions or reasonably ancillary to a legitimate joint venture. And that's why our repair, again – I guess the question is, you're suggesting they're not reasonably ancillary. Yes, Your Honor. And I commend the Court's attention to the American Needle case where just then-judge Sotomayor on the Second Circuit's concurrence in the judgment in Major League Baseball Properties v. Salvino was extensively discussed and quoted. And her analysis, how she did it in the Salvino case in the Second Circuit, which has just been approved by the Supreme Court, is the way you analyze whether a restraint is either a core activity or reasonably ancillary. In this case, surcharges – Don't you believe that there can be no doubt – and I'm just quoting here from must be – and this is the Regents – collectively adopt and enforce uniform rules to operate? Absolutely, Your Honor. But price-fixing a fee that's exchanged between banks and then marked up directly to their customers is neither a core function nor reasonably ancillary. Well, the district court said that the interchange fee was reasonably ancillary because it serves not only just to generate the profits but to promote the deployment of additional ATMs and to compensate ATM owners for allowing consumers to use their product. Your Honor, I don't have the time to cite all the evidence we cited in our brief that that's just not true. What led to an explosion in the deployment of ATMs was the surcharging. Surcharging was banned until 1996. When surcharging became permissible, at every point of sale, there's a bilateral negotiation between the cardholder and the machine, and he can see how much he's being charged as opposed to the hidden fees. I have only a few seconds. I just want to address a couple other points. The 1,000 pure payers of interchange fees are utterly irrelevant to this case. Those transactions are not the subject of this case. It's only the transactions with the five, now five, defendant banks as to which our customers are direct. What do you say to the argument that there are plenty of other putative plaintiffs out there who can sue? But they don't relate to the transactions in this case, Your Honor. Is that what it says, though? It just says, are there other people that are direct purchasers that could sue? And they are direct purchasers, correct? Not for these transactions, Your Honor. These transactions are between the cardholders and five dominant American banks that dominate the Star Network, and that is the tr- those are the transactions at issue. There is no one else that can sue for those transactions unless, in effect, the banks would be suing themselves for something that they're making an enormous profit on. And I can give you some of the ER references on that if Your Honors want them. But you're out of time, so it may not be worth your while. So just wrap up. All right. And the only other thing I would say, Your Honors, is that on the per se issue, where you have a surcharge, where the ATM owner can charge a surcharge at the point of sale, there is absolutely no necessity, reasonably ancillary core function or anything else, for a second charge to be price fixed among the horizontal banks that control the network. Thank you. All right. This matter will stand submitted. Thank you, both sides, for your arguments. Court will stand adjourned until tomorrow morning at 9.00.
judges: Lucero, Callahan, Smith